JONES and another, Plaintiffs in error, vs. THE STATE, Defendant in error.

*April 12—May 6, 1924.*

*Homicide: Defendants resisting arrest: Death of arresting officer: Question as to who fired fatal shot: Confessions: Duress: What constitutes: Subsequent admissions: Preliminary examination.*

1. Evidence that deceased, a railroad watchman, was killed by a pistol shot fired in the dark during a struggle between defendants and police officers while the defendants were resisting arrest, both sides exchanging shots, discloses a sufficient doubt as to whether either of the defendants fired the fatal shot, or whether the officers did so, to leave that question to the jury; and it was error for the court to instruct the jury that deceased was killed by gunshot wounds inflicted by one or both of the defendants.   p. 53.

2. Confessions of the defendants, made at the police station immediately after their maltreatment by a detective or at least part of it, were made under duress and were not admissible against them.   p. 54.

3. The erroneous admission in evidence of such confessions is *held* not cured by instructions to disregard them.   p. 54.

4. Defendants' confessions being made under duress, admissions made by them soon thereafter to the district attorney in the presence of the detective who had been present during the confessions were incompetent as having been made involuntarily, notwithstanding the district attorney informed defendants of their constitutional rights.   p. 54.

5. A preliminary examination of an accused upon transactions out of which a charge of assault with intent to murder arose is sufficient in view of sec. 4653, Stats., which permits an information to be filed for an offense different from the charge in the complaint upon which the warrant issued.   p. 55.

ERROR to review a judgment of the circuit court for Fond du Lac county: CHESTER A. FOWLER, Circuit Judge. *Reversed.*

*Arville Jones* and *Oliver Jones,* the plaintiffs in error, hereinafter called the defendants, were convicted of murder in the second degree and sentenced for that crime. *Arville*

Jones v. State, 184 Wis. 50.

*Jones* was also convicted of assault with intent to murder, and sentence for that crime was imposed upon him. To test the validity of their convictions and sentences they sued out a writ of error.

For the plaintiffs in error there was a brief by *Reilly & O'Brien* of Fond du Lac, and oral argument by *J. E. O'Brien.*

For the defendant in error there was a brief by the *Attorney General, J. E. Messerschmidt,* assistant attorney general, and *James Murray,* district attorney of Fond du Lac county, and oral argument by *Mr. Murray* and *Mr. Messerschmidt.*

VINJE, C. J.    From a consideration of the questions presented upon the review of the case we have concluded that there must be a new trial (1) because the court erroneously instructed the jury that the deceased came to his death by gunshot wounds inflicted by one or both of the defendants; (2) because the court erroneously admitted in evidence confessions of the defendants made at the police station on the evening of the homicide, which error was not cured by their withdrawal with instructions to disregard them; and (3) because the court erroneously submitted to the jury the question of whether or not the confessions made next morning and later were voluntary.

Since there must be a new trial in which most of the evidence will presumably be substantially the same, we purposely forbear to set out the evidence more than is essential to understand the questions decided.

*Arville* and *Oliver Jones* were twenty-three and twenty-one years of age respectively, born and raised upon a farm in Missouri. It seems that previous to the day of the shooting they had gone to the Northern woods for work, but not liking the work they were returning therefrom, and came into the railroad yards of North Fond du Lac about 12:30 on the morning of October 2, 1923, in an iron gon-

dola ore car without permission of the railroad. They were there so found by the deceased, Elno Jacobs, who was a railroad watchman. He accosted them and entered the car, and they, claiming they did not know he was an official or lawful guard, held him up at the point of a thirty-two caliber revolver. Their account of the affair is that when they learned that he was a railroad watchman they tendered him their guns, which he refused to take, and that he told them they were all right and could remain where they were. On leaving the car Jacobs telephoned to the police department at Fond du Lac, four miles distant, and requested aid in arresting the defendants. Officers Cotter and Huhn were sent and joined Jacobs at Forest avenue, about 100 feet east of the railroad tracks and train. They proceeded up near to the car in which the defendants were riding. Jacobs went on one side of the train, or rather passed through it when near the car, and Cotter and Huhn went up the other side. The night was dark. Jacobs entered the car at one end and remained there or near there till he was shot. When he entered, the defendants claim he fired and *Oliver* grappled with him. In the struggle Jacobs' gun went off once, and the bullet entered *Oliver's* face near the jaw but did not inflict a mortal or very serious wound. *Oliver* also shot at Jacobs, but the result was only a flesh wound in the breast. *Arville* saw the two officers and held his gun over the edge of the car and fired at them. He then says the officers immediately shot in his direction near the end of the car where Jacobs and *Oliver* were struggling and that four or five shots were fired; that he ducked down to keep out of their range, and that after they ceased firing he saw his brother *Oliver* still struggling with Jacobs, saw his brother's revolver on the ore in the car; that Jacobs' gun was fired and *Oliver* told *Arville* he was shot and said "shoot him;" whereupon *Arville* said he jumped to one side so that his brother would not be between him and Jacobs and fired a number of shots in rapid succession at

Jacobs, and that when his last shot was fired his brother let go of Jacobs. The officers testify that when the shot was fired towards them they immediately returned the fire, one firing three and the other two shots in the direction of the center of the end of the car where they saw a head and upper part of a man but did not know who it was. They say that no shots were fired in the car after they ceased firing. The deceased had three bullet holes in his head, any one of which would instantly paralyze him and be fatal. A man of ordinary size such as Jacobs would have his head and shoulders above the edge of the car.

Defendants' counsel argue that it was a question for the jury as to who inflicted the fatal wound on Jacobs—the officers or *Arville Jones*. There is a conflict in the evidence as to the order or sequence of shooting and there is sufficient doubt as to who fired the fatal shot to leave that question to the jury. All the revolvers used by the officers and defendants were thirty-two caliber. There is no testimony to show that the wounds in the head—the only fatal ones—were probed to recover the bullets or to show the direction of the shots. Under the evidence, giving it one construction, it is possible that the fatal bullet was fired by one of the officers. The court, therefore, upon the competent evidence in the case, erred in saying to the jury, "It is undisputed that one or the other or both of the defendants shot to death Elno Jacobs." Upon the new trial, under the same or similar evidence, the question as to whether either or both of the defendants fired the fatal shot should be left to the jury.

After Jacobs was shot the defendants surrendered and were taken to the police station. *Oliver* was suffering from the gunshot wound in his face and was taken to the hospital for dressing and then taken back to the police station. F. H. Slivenick, a special agent of the railroad, was notified by Captain Cale that Jacobs was killed, and came to the police station where the defendants were. Without stating what occurred in detail, it is evident that Mr. Slivenick mal-

treated and beat up *Arville Jones* so that his face bled and swelled up considerably.  This treatment is sought to be palliated by the State on the ground that Slivenick felt keenly the loss of his friend Jacobs.  Whatever excuse there may have been on his part, such excuse cannot minimize the effect of the maltreatment on the part of the defendant. Even *Oliver*, the wounded one, was treated roughly.  Slivenick says he slapped *Arville* only once, but the evidence is quite conclusive that his mistreatment of *Arville* was more serious than that.  At that same time in the police station and after the mistreatment or at least part of it was inflicted upon defendants, certain confessions were made by them. On the same day the shooting took place defendants were taken to the office of the district attorney and there made statements.  Slivenick and the chief of police were present. The trial court first admitted in evidence the confessions made at the police station, but in his charge to the jury he instructed them to disregard such confessions.  The confessions were clearly made under duress and not admissible. *Bianchi v. State,* 169 Wis. 75, 171 N. W. 639; *Lang v. State,* 178 Wis. 114, 189 N. W. 558.  And we are of the view that their erroneous admission in evidence was not cured by the instructions, for they could not completely obliterate the effect the confessions left upon the mind of the jury.

As to admissions made before the district attorney, the court instructed the jury that if they found they were made voluntarily they could consider them, but if they found the confessions were made under duress they should disregard them.  Our judgment is that, in view of the fact that the confessions were made so soon after those in the police station and were made in the presence of Slivenick, who had inflicted physical punishment upon the defendants only a short time before, they were not admissible in evidence.  In so ruling we are not unmindful of the fact that the district attorney informed the defendants of their constitutional

rights, and told them they were under no obligations to make any statements and that if they made any such statements they would be used against them.   The district attorney did all he could to safeguard the rights of the defendants and no blame attaches to him.   We feel that in spite of his caution there was a sufficient residuum of duress remaining, especially with Slivenick present, to make the confessions involuntary and incompetent in evidence, and upon the new trial they should be excluded.

When a defendant is in the custody of the law he should be dealt with according to the sanctions of law.   There is no sanction of law in this state, and there will be none so long as courts endure, that tolerates the methods of the inquisition or of the prize-fighting ring.   Our criminal procedure is founded upon principles of humanity, not upon extortion or brutality, and it is complete enough to protect society without resort to .inhuman or barbaric methods. This subject was touched upon in *Bianchi v. State,* 169 Wis. 75, 171 N. W. 639, and fully discussed in *Lang v. State,* 178 Wis. 114, 189 N. W. 558, and it needs no further treatment now.

The claim that *Arville Jones* had no preliminary examination upon the charge of assault with intent to murder is not well taken.   He had a preliminary examination upon the transactions out of which such charge arose, and that is sufficient.   Sec. 4653, Stats., permits an information to be filed for an offense different from the charge in the complaint upon which the warrant issued.   *Bianchi v. State,* 169 Wis. 75, 171 N. W. 639; *O'Keefe v. State,* 177 Wis. 64, 187 N. W. 656.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.   The warden of the state prison will deliver the defendants to the sheriff of Fond du Lac county, who will hold them in custody till discharged by due process of law.